# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| ONE RESIDENCE INCLUDING ANY AND ALL MOBILE | ) |
| DIGITAL DEVICES OWNED, USED, OR CONTROLLED | ) |
| INSIDE THE RESIDENCE UNDER RULE 41 | ) |

Case No.  23-SW-323

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

   I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

   See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed  *(identify the person or describe the property to be seized):*

   See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591 (Sex Trafficking of Children or by Force, Fraud, or Coercion) ; 18 U.S.C. § 1952(a)(3) (A) (interstate travel and transportation in aid of racketeering). | |

The application is based on these facts:

   See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
   18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Jeremiah P. Johnson, Detective
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date: _____9/20/2023_____

City and state:   _____Washington, D.C._____

_____
*Judge's signature*

Robin M. Meriweather
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means | ☑ Original | ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No.  23-SW-323 |
| ONE RESIDENCE INCLUDING ANY AND ALL MOBILE | ) |
| DIGITAL DEVICES OWNED, USED, OR CONTROLLED | ) |
| INSIDE THE RESIDENCE UNDER RULE 41 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____October 3, 2023_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐   at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____9/20/2023_____      _____

*Judge's signature*

City and state: _____Washington, D.C._____      Robin M. Meriweather
                                                    United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>23-SW-323 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*


Robin M. Meriweather

## ATTACHMENT A

*Property to be searched*

The property to be searched is 307 Division Avenue, Northeast, apartment 203, Washington, D.C. (the "Subject Premises"), further described as 3-story, yellow brick, multi-unit apartment building. The number "307" is affixed to the side of the building and on an awning above the front entrance door. The apartment door is on the second floor and is gray with the number "203" affixed on the front.





**ATTACHMENT B**

*Property to be seized*

1.     The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations 18 U.S.C. § 1591 (Sex Trafficking of Children or by Force, Fraud, or Coercion) and 18 U.S.C. § 1952(a)(3)(A) (interstate travel and transportation in aid of racketeering) (the "Target Offenses") that have been committed by Donjoeve Preston ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

  a.  Evidence of the Target Offenses, including but not limited to:

  b.  Evidence of any conspiracy, planning, or preparation to commit those offenses;

  c.  Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

  d.  Evidence concerning materials, devices, or tools that were used to unlawfully commit the Target Offenses;

  e.  Evidence of communication devices;

  f.  Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

  g.  Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.      Records and information that constitute evidence of identity, including but not limited to:

3.      Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the Target Offenses.

4.      Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to:

5.      Photographs, in particular photographs of co-conspirators, assets, and contraband, which constitute evidence of the Target Offenses.

6.      Evidence of relationships between members of a conspiracy, including evidence of identification and evidence of motivation to engage in Target Offenses.

7.      Cellular telephones, SIM cards, computers, laptops, iPads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the Target Offenses.

8.      Safes, both combination and key type, and their contents, which can contain evidence of the commission of the Target Offenses or proceeds from the commission of the Target Offenses.

9.      Indicia of ownership, including, receipts, invoices, bills, canceled envelopes, and keys, which provides evidence of identity as to individuals committing the Target Offenses; and

10.     Digital devices used in the commission of, or to facilitate the above-described offenses.

11.   For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

  a.   evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

  b.   evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

  c.   evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

  d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

  e.   evidence of the times the Device(s) was used;

  f.   passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

  g.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

  h.   records of or information about Internet Protocol addresses used by the Device(s);

i.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12.   Routers, modems, and network equipment used to connect computers to the Internet.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF: ONE RESIDENCE INCLUDING ANY AND ALL MOBILE DIGITAL DEVICES OWNED, USED, OR CONTROLLED INSIDE THE RESIDENCE UNDER RULE 41** | **SW No. 23-sw-323**<br><br>**UNDER SEAL** |

<u>**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**</u>
<u>**FOR A WARRANT TO SEARCH AND SEIZE**</u>

I, Jeremiah Johnson, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 307 Division Avenue, Northeast, apartment 203, Washington, D.C., hereinafter "Subject Premises," further described in Attachment A, for the things described in Attachment B.

2.      Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.      Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

<u>**AFFIANT BACKGROUND**</u>

4.      Your affiant is a sworn member of the Metropolitan Police Department of the District of Columbia. Since 2009, he has worked in the capacity of patrol officer, automobile theft investigator, child abuse investigator, and currently as an investigator at the Federal Bureau of Investigation (FBI) Child Exploitation and Human Trafficking Task Force (CEHTTF). Your affiant has been deputized by the United States Marshal Service as a Task Force Officer. Your affiant's duties and responsibilities are to investigate the sexual exploitation of children, including child pornography and sex trafficking of minors. Your affiant has gained experience in conducting such investigations through training in seminars, classes, and everyday work related to these types of investigations. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.      Based on my training, experience, and participation in these investigations, I know that the following are true in the context of human trafficking investigations:

7.      Individuals who engage in the commercial sexual exploitation of others, commonly refer to themselves as "pimps." They often derogatorily refer to the women whom they are exploiting as prostitutes or hoes.

2

8.      It is not uncommon for these individuals to transport the women they are exploiting and abusing across state lines for the purposes of engaging in prostitution.

9.       Individuals who engage in the commercial sexual exploitation of others use a variety of technique in order to maintain dominance and control over their victims.  They often continuously monitor their victims and will use many tactics to isolate their victims from others.

10.     Individuals engaging in the Target Offenses often recruit young women who have poor self-esteem, low levels of education and/or come from dysfunctional families. These individuals provide and facilitate the essentials to sustain life for the victims who are under their control, including food, clothing, and shelter. Oftentimes individuals who engage in the commercial sexual exploitation of others use illegal narcotics and other drugs as a means to control their victims or as a means to assist their victims work in commercial sex for extended periods of time without sleep.

11.     Individuals involved in this type of criminal activity, and who recruit young women, use psychological manipulation and physical violence to force the females to participate in sexual favors for money, referred to as tricks. The sexual acts include vaginal intercourse commonly referred to as a lay, oral sex commonly referred to as head or blow job, anal sex referred to as Greek, and manual masturbation, commonly referred to as a hand job.

12.     Individuals engaged in the commercial sexual exploitation of women are known to carry weapons to protect themselves from being robbed or assaulted while conducting the illegitimate business of prostitution. These weapons include, but are not limited to, firearms. These individuals also use weapons as a way to threaten and intimidate their victims.

3

13.    Individuals engaged in the commercial sexual exploitation of women often meet their victims on the Track. The Track is the street(s) where the women walk and solicit dates. In major cities, it is commonly referred to as the red-light district. Individuals committing the Target Offenses walk and drive along the Track to recruit new victims, referred to as "sweating a bitch."

14.    These individuals often manipulate their victims into believing that they are taking possession of their personal property for safe keeping. However, the trafficker is often keeping the property so that the victim will follow his orders and return with the proceeds of the sexual acts performed for money.

15.    Individuals committing these offenses commonly monitor their victims during work with constant telephonic communication. They typically use cellular telephones as the primary means of communicating with the women who work for them. The victims also keep in constant contact, via phones such as cellular phones, with other women also working for the same trafficker. When the victims are stopped by the police, they are instructed to call their trafficker and notify him that she has been stopped.

16.    Additionally, individuals committing these types of offenses often use their phones for text messaging with their victims. All modern cell phones contain call management features such as the "call log" for tracking call histories and the electronic phone book for storing names and phone numbers.

17.    It is common for these individuals to use the internet as a way of advertising the women they are exploiting. There are several websites that are used to advertise prostitution. Some examples of these websites are Craigslist.com, Megapersonals.com, Cityvibe.com, Skipthegames.com, and other sites that are known to customers who engage in the solicitation of

4

prostitution. These individuals will often photograph their victims and use those photographs to advertise the women as being available for commercial sex.

18.     In my training and experience, individuals involved in the commercial sex industry are now meeting with increased regularity via social media platforms such as Instagram, Facebook, Snapchat, and other popular social media websites. The individuals, most typically men, who recruit others into commercial sex work for their own financial gain commonly use these types of platforms to promote their lifestyles, wealth, and belongings to recruit other individuals into this criminal lifestyle.  Women who work in the commercial sex industry will often use social media sites to glamorize the lifestyle. This serves to advertise the woman's availability for commercial sex work to potential "dates" and also serves as a way to recruit other individuals, typically vulnerable young women, into working in the commercial sex industry. Furthermore, men who recruit women into the world of commercial sex, who refer to themselves as "Pimps" use social media accounts to directly message or contact and attempt to recruit other individuals, typically young women, for the purpose of working in commercial sex for the "Pimp's" financial gain. Your affiant knows that this type of recruitment allows these self-proclaimed "Pimps" to increase their recruitment exponentially, and normally without leaving the confines of their own home. Based on my training and experience, and my work in other investigations involving these types of criminal offenses, it is not unusual for women working in commercial sex to communicate with the individual they are working for, other women they are working with, or potential customers using the messaging feature of social media websites.

19.     Individuals who engage in the commercial sexual exploitation of women often present themselves in real life and on social media as committed to the "pimp" lifestyle or "the

5

game" through "pimp clothing," such as fur coats and colorful suits, expensive jewelry and watches, and large amounts of cash.

20.     Individuals who engage in these crimes often engage in money laundering and other illicit financial practices to disguise the source of the large amounts of money they receive from their illegal commercial sex activities.

21.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C § 1591(a)(1), Sex Trafficking of Children or by Force, Fraud or Coercion and 18 U.S.C. § 1952, Interstate Transportation in Aid of Racketeering Enterprises (the "Target Offenses") that have been committed by DONJOEVE PRESTON, born in October 1995, and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject. There is also probable cause to search the Subject Premises, further described in Attachment A, for the things described in Attachment B.

## **PROBABLE CAUSE**

22.     On August 17, 2023, the D.C. Child Abuse and Neglect Hotline received a report regarding Adult Witness 1 (herein "AW1"). AW1 reported to her social worker that her boyfriend, later identified as PRESTON, beat her up.  AW1 sent pictures of bruises she suffered to her social worker.  It was further reported by AW1's social worker that PRESTON does not allow AW1 to leave the home. The report also mentioned there was suspicion AW1 was being sex trafficked by PRESTON. Law enforcement has viewed the pictures of AW1's injuries and observed that AW1's eye appeared to be swollen.

23.     Law enforcement made multiple attempts to make contact AW1 at PRESTON's residence, 307 Division Avenue, Northeast, Washington, D.C. (the Subject Premises). It was later learned from AW1's social worker that PRESTON was holding AW1 inside the Subject Premises, and that he was not letting her speak with the police. Law enforcement also learned that AW1 had active arrest warrants.  AW1 told her social worker that she was afraid to get arrested, even though she was currently being physically abused.

24.     On August 30, 2023, AW1's social worker reported to the Hotline that she spoke with AW1 over the phone. AW1 told her social worker that PRESTON beat her, because she wanted to stop "selling her pussy." On August 31, 2023, the D.C. Child Abuse and Neglect Hotline received a report from AW1's social worker. It was reported that PRESTON broke AW1's phone, pulled out AW1's hair, and hit AW1 with a wrench. Furthermore, AW1 reported to her social worker that she broke the window out of a car she was riding in with PRESTON and ran to get on a Metro Bus (Washington Metropolitan Area Transit Authority). It was reported that PRESTON told AW1 he was going to get people around "37th" (neighborhood in Washington, D.C.) to kill her.

25.     On September 15, 2023, AW1 agreed to meet with law enforcement and be interviewed.  During this interview, AW1 said that she met PRESTON a few months ago, around Mother's Day.  She told law enforcement that she was in a vulnerable state after "losing her kid" (AW1's child was placed into foster care by D.C. Child and Family Services Agency). AW1 had her own apartment at the time, but she said that PRESTON became so controlling that he didn't want her to leave his sight.   As a result, AW1 began living with PRESTON.  AW1 reported she lived with PRESTON at the Subject Premises, which was PRESTON's main residence. AW1

7

said she was not able to return to her apartment because PRESTON threatened to harm her or the staff at her apartment complex.

26.     AW1 described multiple incidents of PRESTON assaulting her and showed law enforcement scars on her body from these attacks. AW1 stated that some of the scars were from trying to kill herself to get away from him. AW1 showed a small scar on her neck from a time PRESTON cut her with a machete. She described incidents when PRESTON hit her in the head with a lamp, and another where PRESTON stomped on her head and ribs. AW1 described how PRESTON stomped her in her mouth, knocked her tooth out, and caused her to pass out.

27.     AW1 mentioned an incident when the Metropolitan Police Department of the District of Columbia (MPDC) responded to the Subject Premises.  AW1 said MPDC was banging on the apartment door, and that they could hear her screaming. AW1 stated that MPDC was telling PRESTON that they would kick it down if he did not open the door. AW1 said PRESTON told MPDC that she (AW1) was fine, and that nobody was coming outside. AW1 told law enforcement that PRESTON had "beat the fuck out me" only a few seconds before law enforcement arrived.

28.     AW1 stated that she believed PRESTON and the mother of his child, Adult Witness 2 (herein AW2) "plotted" to have her work in their commercial sex enterprise. AW1 said she had seen messages on Instagram between AW2 and PRESTON about how pretty AW1 was and how they could "turn her out."[1] AW1 did not know that PRESTON and AW2 were

---

[1] "Turn out" is a term known to law enforcement that means leading someone to engage in prostitution.

involved in operating a commercial sex enterprise when she originally met them. However, AW1 would hear AW2 talk about going on "plays" often and she knew the term meant to engage in commercial sex acts. AW1 stated that PRESTON told her he had previously been arrested for human trafficking in Maryland but that he got the charges expunged.[2] AW1 said PRESTON had been pimping AW2 and that the two recruit girls together.

29.     AW1 told law enforcement that PRESTON posted online sexual solicitation advertisements of her on Megapersonals,[3] and that he wanted her to work for him performing commercial sex acts. AW1 said PRESTON uploaded pictures of her from Instagram and then would communicate with the clients himself, portraying himself as AW1. AW1 stated the phone number PRESTON was using to post in the advertisements was (771)201-4214. AW1 stated that PRESTON uses that phone number.  AW1 had a cellphone that she was using to communicate with PRESTON, but he ended up taking it back because he learned AW1 was using it to communicate with her social worker.

30.     AW1 stated she did not want to perform commercial sex acts for PRESTON. Since PRESTON was in control of the communication with the clients, AW1 said she did not know what the clients were expecting. One time, AW1 said a male was talking about "wall sex" and she did not know what that meant. AW1 stated she ended up taking the $300 the male gave her for sex acts and ran off.  During this interview, AW1 stated that she only performed a

---

[2] PRESTON was arrested in Prince George County, Maryland on March 13, 2018, but the case was ultimately nolle prosequi.

[3] Megapersonals is a website that posts online sexual solicitation advertisements.

commercial sex act one time.[4]  According to AW1, a male drove his car to the rear of the Subject Premises. AW1 went outside and performed oral sex on the male for money in his car.

31.    AW1 stated that PRESTON used the money she gave him from the commercial sex acts to buy drugs (MDNA and Marijuana). AW1 said if PRESTON did not have drugs, he would "freak the fuck out." AW1 stated she could make a quick $90 from performing commercial sex acts and get PRESTON some drugs, which she did so "she would not have to deal with him." AW1 said PRESTON would tell AW1 that he had a "play" coming after beating her ass. PRESTON would wipe AW1's face and tell her to get herself together. PRESTON would have AW1 put on makeup, lashes and even put her hair in a ponytail after ripping out her hair. PRESTON would state that AW1 had calls today and to "just do it."

32.    Law enforcement located online sexual solicitation advertisements of AW1 posted on Megapersonals between September 9, 2023 and September 15, 2023. The advertisements were posted in the Washington, D.C. section of the website and meant to target clients in the District of Columbia. The advertisements contained pictures of AW1 with the header: !!JUST ARRIVED!! BIG JUICY BOOTY Hornyan ready Guaranteed to make you CUM GOOD Pussy SPECIALS. The contact phone number in the advertisement was (771)201-4214.

33.    On August 16, 2023, MPDC responded to the Subject Premises following a 911 call.  MPDC Officers attempted to gain access to the Subject Premises, but PRESTON refused to

---

[4] Even though AW1 initially stated she engaged in a commercial sex act only one time, there were other statements made by AW that would indicate she engaged in commercial sex acts on more occasions. In your affiant's experience, victims of sex trafficking often minimize or deny engaging in commercial sex acts.

let them inside. MPDC Officers eventually talked to PRESTON and AW1 from outside as AW1 and PRESTON put their heads out the second-floor window of the Subject Premises. AW1 told the MPDC Officers at the time that she was okay. No further action was taken by the MPDC Officers that day.

34.     On September 19, 2023, at approximately 1235 hours, AW1's social worker called your affiant. AW1's social worker stated she had AW1 on the phone and she was in distress. AW1 was using the cell phone of an unknown person to call her social worker. AW1 stated that the Subject had just "beat her ass" and was threatening to kill her. AW1 stated he was walking down the street from the Subject Premises and would meet your affiant at the BP Gas Station at the corner of Division Avenue and Nannie Helen Burroughs Avenue, Northeast, Washington, D.C. AW1 then hung up the phone. Your affiant notified dispatch and had a marked patrol unit respond to the location for AW1's safety. Upon your affiant's arrival at the location, MPDC Officers were on scene, but that they were unable to find AW1.[5]

35.     Your affiant and MPDC Officers responded to the Subject Premises and knocked on the apartment door. PRESTON answered through the closed apartment door but refused to open the door. He stated that AW1 was not inside the Subject Premises and that he had not seen her in a few days. Your affiant called out AW1's name, but heard no other voices from inside the Subject Premises. PRESTON stuck in his head out the second-story window of the Subject Premises and made a phone call. After ending the phone call, PRESTON told your affiant that AW1 went to Six Flags that day around 11:00 a.m.

_____

[5] On September 19, 2023, Six Flags America, which is located in Bowie, Maryland, was closed.

11

36.    Your affiant called the phone number which AW1 used to call her social worker. An unidentified male answered and stated that he was around Division Ave, Northeast, Washington, D.C. when a female asked to use his cell phone to call her social worker. The unidentified male stated the female then made a call and went into an alley. The unidentified male said he did not want to get involved, and refused to provide any further details.

37.    Based on my training and experience and the facts set forth above, there is probable cause to believe that the PRESTON is engaged in the ongoing commercial sexual exploitation of women, including AW1, and that a search of the Subject Premises is likely to lead to the recovery of evidence of his illegal activities. Namely, there is probable cause to believe that electronic devices located at the Subject Premises will contain evidence of PRESTON's commercial sexual exploitation of women, including his efforts to recruit women to work for him in commercial sex, conversations with women working for him in commercial sex about their activities on his behalf, photographs that he took of these women on his phone that were used in commercial sex advertisements, and contacts of victims that he is currently exploiting or previously exploited. A search of the Subject Premises is also likely to yield other evidence indicative of the PRESTON's commercial sex trafficking, including large quantities of cash reflecting PRESTON's illegitimate earnings.

**TECHNICAL TERMS**

**38.**    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices

such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

        b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as

14

described above, and personal computers, perform many different functions and save data associated with those functions.

        d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

15

       f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

       g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via

digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example

17

usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

       m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

       n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

           i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P

18

software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.    Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

o.    "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An

19

authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

39.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the Subject Premises, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my

20

knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the Subject Premises, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

        a.      Individuals who engage in criminal activity, including violations of 18 U.S.C § 1591(a)(1), Sex Trafficking of Children or by Force, Fraud or Coercion and 18 U.S.C. § 1952, Interstate Transportation in Aid of Racketeering Enterprises, use digital devices, like the Device(s), to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device(s), documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

        b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to

21

that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

     c.  Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

40.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive,

23

memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c. A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team

24

and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to commit violations of 18 U.S.C § 1591(a)(1), Sex Trafficking of Children or by Force, Fraud or Coercion, and 18 U.S.C. § 1952, Interstate Transportation in Aid of Racketeering Enterprises the individual's device will generally serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

25

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

41.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

26

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-

27

text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal

activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

    42.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

        a.      Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

           1.      Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and

29

transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the

30

contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

43.    I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

Jeremiah Johnson
Detective (D1-1262)
Metropolitan Police Department of D.C.

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September 20, 2023.

HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE